IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,210

In the Matter of DANIEL HART PHILLIPS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed January 12, 2018. One-year suspension.

*Penny R. Moylan*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*G. Craig Robinson*, of Wichita, argued the cause, and *Daniel Hart Phillips*, respondent, argued the cause pro se.

PER CURIAM:  This is an uncontested original proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Daniel Hart Phillips, of Wichita, an attorney admitted to the practice of law in Kansas in 1978.

On February 16, 2017, the office of the Disciplinary Administrator filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). Respondent filed an answer on March 13, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on May 31, 2017, at which the respondent appeared personally and by counsel. The panel determined that respondent violated KRPC 8.4(g) (2017 Kan. S. Ct. R. 379) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

1

. . . .

"8.     On April 27, 2016, A.J., a prospective client, called the respondent, seeking representation. During the telephone conversation, the respondent called A.J., 'baby,' which made A.J. feel uncomfortable. After the respondent called A.J. 'baby,' A.J. tape recorded the remainder of their telephone conversation. The respondent scheduled an office appointment with A.J. for the next day. The remainder of the telephone conversation went as follows:

'[By A.J.] You didn't forget about me, did you?

'[By the respondent] No, what do you need? With a voice like that, I can't forget that.

'[By A.J.] Okay.

'[By the respondent] So you want to bring your paperwork and come see me tomorrow at noon?

'[By A.J.] Yeah, that'll be fine.

'[By the respondent] Do you know where it's at?

'[By A.J.] No, I'm not really familiar.

'[By the respondent] Okay. So write this down. Okay?

'[By A.J.] Okay.

'[By the respondent] Tell me when you're ready.

'[By A.J.] I'm ready.

'[By the respondent] 1919 North Amidon.

'[By A.J.] Uh-huh.

'[By the respondent] I'm on the third floor, Suite 312. When you get off the elevator on the third floor, you do a U-turn to your left.

'[By A.J.] Okay.

'[By the respondent] I'm down the hallway. Now, do you know that Amidon is up there at 21st and Amidon where Twin Lakes is?

'[By A.J.] Yeah, I know where—I know where that's at. You need me to bring you pretty much everything that I got.

'[By the respondent] To show that you guys are married. Okay?

'[By A.J.] Okay.

'[By the respondent] And don't wear any under panties.'

A.J.'s nine year-old daughter overheard the respondent's request.

"9.     On April 28, 2016, the respondent called A.J. three times to confirm their appointment, but A.J. did not answer the telephone calls. A.J. did not attend the scheduled meeting.

"10.     On May 6, 2016, A.J. filed a complaint with the disciplinary administrator's office regarding the respondent's conduct. Additionally, A.J. filed a police report against the respondent. The respondent's statement caused A.J. to suffer anxiety and depression. Additionally, the respondent's statement caused A.J. to lose faith in the legal system.

3

"11.     On June 15, 2016, the respondent provided a written response to the complaint. The respondent's response, in its entirety, is as follows:

'Please find this letter as a response to the above referred to complaint by [A.J.]. I apologize that my response took a bit longer than the twenty days normally allowed in matters of this nature. It was my intent to ultimately provide Ms. Baird, Mr. Morgan and most importantly [A.J.] an honest and heartfelt response. I have spent a considerable amount of time daily internalizing and reflecting upon the facts surrounding and involving my contact, attitude and statements towards [A.J.]. I request that you share this letter in its entirety, with [A.J.].

'Let me first and foremost apologize to [A.J.] and her child, as well, for by [*sic*] behavior, my conduct and the things I said. There was absolutely nothing said to me on her behalf that would have warranted the outlandish, crude, and totally unacceptable remarks I made towards her. Without warning and totally without provocation on her part, I assaulted her very person and character in such a manner as to affect her life <u>as a victim</u>. I have detrimentally impacted both her life and that of her child. In the end, I seek her forgiveness and hope that she can forgive me, feeling that forgiveness coming from her may allow her the ability to move forward and put this matter both in some grace, perspective and behind her.

'"Good people do bad things" is a subject that I encounter all the time with my clients and at the age of 65 and with two sons of my own at home who are 8 and 6, it is a regular subject that I deal with both myself and with them. My oldest son, William, is going into the third grade and when he gets in trouble in school, I always emphasize that . . . Being truthful with himself and then others is the first step to correcting the behavior and then the problem.

'In this particular situation, I began individual counseling with Renee C. Fields, LSCSW, 1919 North Amidon, Suite 108, Wichita, Kansas 67203. Her office number is 316.425.0033 and her fax number is 316.425.0239. I have executed a Release of Information to both Kate Baird and Terry Morgan.

4

'As I stated earlier, my behavior towards [A.J.] was inexcusable. It is not my character to make those kinds of remarks to anyone, let alone made to a complete stranger. For a few weeks before I even entered into counseling, I continually pondered what was going through my mind at the time that would have resulted in those remarks. Allow me to share two very important and relevant circumstances.

'1.     The morning of April 27th, I was at the Courthouse and ran into a female client whom I had not seen or dealt with in years. She had some domestic issues which she only lightly went into. She had no money to pay me but as it happens from time to time, you find people, potential clients, who will offer sexual favors in a desperate attempt to get them through a bad legal situation. Those encounters throughout the life of my legal practice have always left me disgruntled and result in bringing up a past bad memory of my ex-wife's behavior when she was involved in her drug addiction. In regard to my encounter at the Courthouse, I was very direct and adamant that the behavior and approach towards me was not welcome.

'2.     I left the Courthouse and in driving back to my office, all I could think about was my own past experience with addiction and recovery and how me [*sic*] ex-wife's [] addiction impacted me. My own recovery came sooner than her own. I remembered how she would disappear for days into her active using and with no money she prostituted herself by the use of sex to obtain drugs. In the end and in an attempt to help her, I went to Kansas City where she was living, and obtained furniture and an apartment for her to live. I spent almost $5000.00 on that specific weekend and invested tremendous emotion to help. That trip was the last time I saw or heard from her. As a result I have felt angry, used, bitter and betrayed for a long time. It was an experience and feeling I had thought I could suppress for years.

'I came back to the office in that frame of mind and without gathering myself and settling my thoughts, I encountered [A.J.], an innocent and complete stranger. The above explanation, I am certain, represents only a small representation of the thoughts that ran through my head on April 27th.

5

'I now better understand that sobriety also results in residual issues. Counseling so far has exposed me to the fact that the process of sobriety begets anger issues. That results in . . . Good people making bad decisions. I can only hope that your investigation may see this incident as isolated in nature. My own phone records show that I attempted to contact [A.J.] two or three times before her scheduled appointment on April 28th. My primary purpose was to apologize to her for the statements I made and the stress I caused her and her child.

'Please find this as my response to your initial letter. I again apologize to [A.J.] and her child. I believe in my 38 years as an attorney I have touched many lives in positive ways and I hope you will see my aberrant behavior as an anomaly . . . yet a serious one at that. I remain available to your office to answer any questions and/or provide additional information.'

"*Conclusions of Law*

"12.     Based on the respondent's stipulation and the findings of fact above, the hearing panel concludes as a matter of law that the respondent violated KRPC 8.4(g), as detailed below. The deputy disciplinary administrator also alleged that the respondent violated KRPC 8.4(d). The hearing panel concludes that the facts do not support a conclusion that the respondent violated KRPC 8.4(d). Accordingly, the allegation that the respondent violated KRPC 8.4(d) is dismissed.

"KRPC 8.4(g)

"13.     'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent engaged in conduct that adversely reflects on his fitness to practice law when he asked a prospective client to not wear 'under panties' to her appointment with him. The hearing panel concludes that the respondent violated KRPC 8.4(g).

"14.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"15.     *Duty Violated*. The respondent violated his duty to the public to maintain his personal integrity.

"16.     *Mental State*. The respondent knowingly violated his duty.

"17.     *Injury*. As a result of the respondent's misconduct, the respondent caused mental distress to A.J. and her child.

"18.     *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.     Prior Disciplinary Offenses. The respondent has been previously disciplined on two occasions.

(1)     On October 25, 1996, the Supreme Court placed the respondent on probation for having violated KRPC 1.3 (diligence), KRPC 1.4 (communication), KRPC 1.5(b) (fees), KRPC 1.15(a) (safeguarding property), KRPC 1.15(b) (safeguarding property), KRPC 1.16(a) (termination of representation), KRPC 3.3(a)(1) (candor to the tribunal), KRPC 4.1 (truthfulness in statements to others), KRPC 8.4(a) (misconduct), KRPC 8.4(b) (misconduct), KRPC 8.4(d) (misconduct), and KRPC 8.4(g) (misconduct). The respondent failed to comply with

7

the terms and conditions of probation and on October 18, 2001, the Court suspended the respondent's license to practice law for an indefinite period of time. Then, on October 6, 2005, the Court reinstated the respondent's license to practice law.

(2) On November 17, 2011, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.4 (communication).

b. Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. The hearing panel concludes that the respondent engaged in deceptive practice during the hearing.

(1) In his response as quoted above, the respondent stated that he ran into an old client at the courthouse, she offered him sex for legal services, he became angry, and, as a result of his prior experiences, he took out his anger on an innocent bystander. At the hearing, however, the respondent's testimony included many facts not included in his initial complaint. The respondent testified:

'Q.    [By Ms. Moylan] Let's just get to the heart of the matter in this issue of the mistaken identity of [L.] and [A.J.]. You testified earlier that you ran into [L.], a former client, at the courthouse?

'A.    [By the respondent] Yes.

'Q.    She asked you to do some domestic work for her. Is that correct?

'A.    Yes.

'Q.    And then she told you that she did not have money to pay for your services, but that she would offer sexual favors in exchange. Is that correct?

8

'A.     Yes.

'Q.     And what did you say to [L.] at that point in time?

'A.     In short, I said to her, you know, my wife and I went through an addiction and my wife—my wife gave up her body for that and I wish you wouldn't bring that subject up to me again. And that was back and forth so much of the conversation.

'Q.     Was there any indication at the end of that conversation that she was still interested in using you as her attorney in the domestic case?

'A.     Yes.

'Q.     Okay. So you travel back to the office after this court appearance—excuse me, let's go back to [L.]. How did you leave it with her then?

'A.     I just said if you—if you want—if you—if you're interested, I'm willing to talk to you about it, you can call my office.

'Q.     So you travel back to your office, and when you get to the office there's a phone message for you from [A.J.]. Is that correct?

'A.     No, it—all it said was [A.J.].

'Q.     Okay. [A.J.]. And what did you think at that moment when you got the phone message that said from [A.J.]?

'A.     I thought it was from [L.]. And—and I have to say that as I approached it I walked into the office with this fog of anger that I was involved in.

9

'Q.    So you call [A.J.], did you get her on the phone when you called her?

'A.    I don't think initially I did. I'm just not certain about that.

'Q.    Okay. 'Um, would you disagree with . . . [A.J.]'s, testimony that she called you, you called her back, and she had to call you back, and you guys arrange for a time to talk to her at that point in time?

'A.    That could be very possible.

. . . .

'Q.    All right. So when you get to the office and you see the message from [A.J.], that you think is [L.], you call her back, you think you leave a message. Long story short, you get on the phone with [A.J.]?

'A.    Yes.

'Q.    When you began talking to her, did you realize, before you made the comment about coming to the office without any under panties on, that she was not [L.]?

'A.    No, I did not at the time.

'Q.    When did you realize it was not [L.]?

'A.    I got off the phone, I settled into my office, and I got to thinking about the conversation and then it just kind of came clear to me that maybe I talked to the wrong person.

10

'Q. Okay. So let's—I want to make sure I have your testimony correct. The whole time that you talked to [A.J.] you believed it was [L.], the former client that you had seen at the courthouse?

'A. I thought so.

'Q. Okay. And let's get the record correct, whether it was [L.] or [A.J.], you believed you were talking to someone who was seeking your legal services. Correct?

'A. Absolutely correct.

'Q. So here's my next question, if you believed that you were talking to [L.], who had just made an offer to do sexual favors for legal work, why did you make that comment to her?

'A. You know, I think—and I thought about this and—and some of this came out in counseling, for me it was a very sarcastic comment I made to her. And I think some times we hide our distress and our anger in sarcastic comments.

'Q. So it's your testimony today, before the Panel, that the comment that you made to [A.J.], believing she was someone who had just made an offer for sexual favors, was not done in an attempt to fulfill that offer?

'A. No, it was not done with that intent. It was—it was purely sarcastic and angry in nature.

'Q. Okay. You said after you got off the phone with [A.J.] you realized at that point in time you had been talking to the wrong person, how did you realize that?

11

'A.      Because—well, you know, my mind cleared and I wasn't angry any more and I was able to think through my thoughts, and I thought, I don't think that was the same person.

'Q.      And what did you do then?

'A.      Well, either that day or the next day I called, and I believe I left messages to confirm she was—I was trying to, A, confirm she was still coming in, and, B, seek the opportunity to apologize to her.

'Q.      Because at that point in time, regardless of whether it was [A.J.] or [L.], you realized you had done something wrong?

'A.      I did.

'Q.      Why didn't you report your conduct to our office?

'A.      Can I tell you I—I guess with hindsight self-reporting might have been the very best thing to have done, and I didn't do it. And—and I have no explanation. It was a mistake.'

The hearing panel questions the veracity of the respondent's testimony. Had the respondent confused the two client's names, it stands to reason that the respondent would have indicated as such in his response to the initial complaint. Further, there would have been some evidence in the conversation itself that the respondent believed that he was talking with his former client not a new client he had not yet met. *See* ¶ 8 above.

(2)      Finally, the respondent testified that when he made the statement to A.J., he was angry and sarcastic. The hearing panel listened carefully to the recording of the telephone call multiple times. The respondent's tone was pleasant. The hearing panel did not recognize any angry or sarcastic tones in the respondent's words. Who the respondent

thought he was talking to and his intent behind the statements is something that only the respondent knows. However, based on all the evidence presented at the hearing on this matter, the hearing panel finds the respondent's testimony regarding his tone, his intent, and who he believed he was speaking with, to lack credibility.

c.     Vulnerability of Victim. A.J. was vulnerable to the respondent's misconduct.

d.     Substantial Experience in the Practice of Law. The Supreme Court admitted the respondent to practice law in the State of Kansas in 1978. At the time of the misconduct, given the previous suspension, the respondent had been practicing law for approximately 34 years.

"19.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for [discipline, the hearing panel, in this case, found the following mitigating circumstances present:]

a.     Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct. The respondent sought treatment from Renee C. Fields, LSCSW. The respondent has been in continuous treatment with Ms. Fields since June 9, 2016. Ms. Fields diagnosed the respondent with adjustment disorder with disturbance of conduct. According to Ms. Fields, the respondent's conduct was situational, he has made improvements, and his prognosis is good:

'Q.     [By Mr. Robinson] What history did you gather from Mr. Phillips at that time?

'A.     [By Ms. Fields] That his presenting problem was that he had taken a call from a potential female client at a time that he had been in court that morning, and a completely different client, 'um, asked if he would be interested in trading sex for his legal services. That was very

13

upsetting to him. So, later in the day when he got on the phone, he did something very inappropriate with a woman on the phone. He set an appointment for her and then told her don't wear any panties. He explained that the woman had said that her child heard that. It was distressing, obviously, for her, and her child. He was pretty shocked with his own behavior and needed some help with how did that happen and how do you keep it from happening again.

'Q.     How did you find his mental state at that time as he was relating this fact pattern to you?

'A.     What I assessed was that he was currently under enough distress that his thresholds, where he would control his behavior, were lowered. I remember initially wondering if he had an impulse control disorder, and later on decided that really wasn't quite the issue. 'Um, he had a—a surprising lack of awareness of what a difficult situation he was in currently. He was very aware of why the topic of sexuality was angering to him and connected that to a remote problem, but it was a current difficult situation that diminished his ability to deal with that in an appropriate way.

'Q.     What was the current—that, then, current difficult situation that he was—that you learned?

'A.     That Dan was going through a divorce. His—I believe the first time I saw him his wife may not have filed, but they had been in couple's therapy. He knew that there was a problem. Shortly after I began seeing him he let me know his wife explained that she had filed for divorce, but they were living in the family home with their two children, and week after week after week, month after month, he never got served and so he was in quite a limbo where his perception was his wife, who was unhappy with him, had all the power and he was walking on eggshells.

14

'Q.     Did you develop a diagnosis following your examination of Mr. Phillips?

'A.     Yes, I did. I did rule out the impulse control diagnosis. I didn't feel like that was accurate, and gave him a diagnosis of an adjustment disorder with a disturbance of his conduct.

'Q.     What does that mean in a more direct sense?

'A.     It means that his conduct problems were situational. They were not the result of any more serious pathology.

'Q.     Serious pathology would have been suggestive of what, then, Ms. Fields?

'A.     'Um, of being antisocial; of being terribly depressed; of having anxiety disorder. Even an impulse control disorder. Nothing like an intermittent explosive disorder. Those would be more—perhaps even more physically or chemically caused than situational.

'Q.     And you didn't conclude that he had any of those issues?

'A.     Right. I feel like I ruled those out and became convinced it was situational.

'Q.     What—did you develop a treatment plan for you and Dan's follow-up?

'A.     I did.

'Q.     What was that?

'A.     'Um, our treatment goals were, 'um, to deal with his anger, and that would be to learn some aggression replacement, because I

15

want to point out, the feeling behind what caused the incident wasn't any kind of a lust or sexual desire. The feeling was anger. So the topic was sexual, but the feeling was anger. So I wanted to improve his responses to his own anger. His coping skills. I wanted him to learn to think ahead to the consequences, to do something that we call thought stop and thought restructure. So he's learning a lot about anger and how your thoughts, 'um, wind up becoming your feelings.

'So, I also, 'um, put in place with him a monitoring of how he is doing. We call it a subjective index of distress, and it is to daily record, on a scale of 0 to 10, how distressed he feels. And emotion doesn't matter. It could be anger. It could be anxiety. It could be depression. It could be overwhelmed. But all of them put together, how uncomfortable they are. So we had to give him some coping skills and make him aware of how poorly he's doing instead of what he had been doing previously, which is compartmentalizing. Meaning, he stuffs these bad feelings in some compartment. He distracts himself with work. And, then, because he doesn't deal with them, then they pop out at very unexpected times. And, you know, he has behavior that gets in him trouble.

. . . .

'Q.     Okay. What is the—has Mr. Phillips been successfully completing his plan that you out—that you laid out for him all those months ago?

'A.     Yes, he has.

. . . .

'A.     I'm very—I'm very—that's okay. I'm very pleased with how actively he participates.

16

'Q.      And what types of emotional issues did you address with—that you are counseling with Mr. Phillips, beyond what you were talking about a moment ago, anger control, things like that. Anything else?

'A.      'Um, well, it's—it is to replace angry reactions with other things like dis—you know, distract yourself away, which may seem a contradiction to compartmentalize and not deal with it, but this office here becomes the time where we do deal with it. So, we have talked about an old relationship where the topic of sexuality was very hurtful to him and he was powerless. 'Um, I think especially for him to realize how poorly he was functioning in his current marriage was helpful because he progressed very quickly through an acceptance, which is a very important skill, his acceptance both of how his marriage was probably going to fail, he's going to see his children less, and an acceptance of having to answer to the disciplinary committee about his behavior back last summer.

'Q.      What is the continuing suggestion for Mr. Phillips as he goes forward with your treatment?

'A.      I have asked him to continue to come once a month. I typically review with him what his numbers of distress were and in what circumstances they're there. 'Um, of course, the hearing today is a big stressor for him, and I think he has a great acceptance of that. So, we just look at what are the things that, 'um, he—I think he came to realize he needed to get busy and get himself in a better place in his current situation, and in talking that through, he's made some really, 'um, great decisions on his own so that he's in a better place.

'His circumstance has changed from living in the home with a woman who is clearly on a path to divorce him, and he doesn't get served for three months, then finally he's served and he moves to his sister's home. That's not really good for him either. That's, you know, the home

17

of a woman, not his home. He realized that wasn't good for him and moved out into his own place and now he is much more stable. He's very much stabilized as a single parent right now. And he looks at things differently so he's not as upset, for example.

'One of the problems with the divorce is how much less he'll see his children. Very upsetting to him. Now he's—he has a different way of looking at that saying, I see my children less, but my relationship with them is much better.

. . . .

'Q.     So, mainly, I'll ask it this way, do you—from your dealing with Dan, do you think he's getting better in dealing with some of these things that caused him to have this outburst with this unknown lady?

'A.     Very much so.

'Q.     Why?

'A.     Well, he has learned if he wants to control his behavior, he has to see it coming. We experience anger as a chain reaction, kind of like a nuclear bomb is a chain reaction. Sometimes things happen so fast, you feel you don't have control, but you do have control. 'Um, so an important part of the therapy is to identify the places where he best be on guard because he could go downhill. And because he's no longer stuffing emotion and pretending he's okay with them, he's more realistic about how he's doing. I think his prognosis is very much better.

'From a behavior modification point of view, my prognosis would be he's unlikely to repeat this. You know, we repeat behavior—the theory is we repeat behaviors there's reward for. We don't repeat the behaviors that there is consequences for. And for Mr. Phillips, 'um,

18

there's zero reward in this impulsive sexual talk towards others, and the consequences are very big.

'From a cognitive, which really means the way you think about things, I think he has learned that his thoughts have to be monitored and kept in control. He's not free to think this is unfair. I don't deserve this. You can't put me through all of this, maybe too much. And instead thinks these things happened. I'm strong enough to go through hard times. So his own expectations for how much unhappy things in a life he must accept, 'um, has changed enough that I think he can come up against difficult circumstances and his behavior not be a problem.'

b.      The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations. Finally, the respondent stipulated that his conduct violated KRPC 8.4(g).

c.      Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

d.      Remorse. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

e.      Remoteness of Prior Offenses. The discipline imposed in 1996 and 2001 is remote in character and in time to the misconduct in this case. The discipline imposed in 2011 is remote in character but not in time.

"20.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"21.    The deputy disciplinary administrator made a conditional recommendation. The deputy disciplinary administrator recommended that if the hearing panel concludes that the respondent attempted to consummate a sexual relationship with a past or prospective client, that the respondent be suspended for a period of one year, that he be required to serve 90 days of the suspension, and that he then be placed on probation. The deputy disciplinary administrator alternatively recommended that if the hearing panel concludes that the respondent did not attempt to consummate a sexual relationship with a past or prospective client, that the respondent be suspended for a period of one year and that he be immediately granted probation from that suspension, subject to the terms and conditions of his plan of probation. Finally, the deputy disciplinary administrator recommended that the respondent's probation be supervised by a licensed attorney.

"22.    The respondent requested permission to supplement the record with a proposed probation supervisor within 10 days. The respondent requested that he be censured or placed on probation.

"23.    The hearing panel granted the respondent's request to supplement the record with a proposed probation supervisor. On June 28, 2017, the respondent submitted a supplement to the amended probation plan which included a monitoring plan and a proposed probation supervisor.

"24.    As acknowledged by his counsel during closing argument, the respondent did a stupid thing by suggesting to a prospective client that she attend a

20

meeting with him without wearing her 'under panties.' The respondent's misconduct caused A.J. to suffer mental and emotional distress and to lose faith in the legal system. The hearing panel, of course, is troubled by this inappropriate and alarming conduct. However, in addition to the underlying misconduct, the respondent compounded the misconduct by being less than forthright in the disciplinary process.

"25. The hearing panel is mindful of the Supreme Court's comments in *In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.'). Because the hearing panel concludes that the respondent was less than forthright in the disciplinary process, the hearing panel concludes that the respondent should serve a short period of suspension.

"26. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of one year. The hearing panel further recommends that after the respondent has served 30 days of the suspension, the respondent automatically be placed on probation for a period of two years, subject to the terms and conditions set forth below:

       1. *Practice Supervision*. Roger Falk will serve as the respondent's practice supervisor. The respondent will meet with the practice supervisor on a monthly basis. The respondent will allow the practice supervisor access to his client files, calendar, and trust account records. The respondent will comply with any requests made by the practice supervisor. The practice supervisor will prepare a quarterly report to the disciplinary administrator regarding the respondent's status on probation. The practice supervisor will be acting as an officer and an agent of the court while supervising the probation and monitoring the respondent's legal practice. As supervising attorney, the practice supervisor will be afforded all immunities granted by Kan. Sup. Ct. R. 223 during the course of his supervising activities.

2.     *Office Assistance*. The respondent will continue to employ an office assistant. The office assistant will sit in on all meetings with female clients throughout the period of probation. When the respondent speaks by telephone with female clients, the respondent will conduct the call by speaker phone and his office assistant will listen in on each telephone call throughout the period of probation.

3.     *Psychological Treatment*. The respondent will continue his psychological treatment throughout the period of supervised probation, unless the counselor determines that continued treatment is no longer necessary. The counselor will notify the practice supervisor and the disciplinary administrator in the event that the respondent discontinues treatment against the recommendation of the counselor during the probationary period. The respondent will provide the counselor with an appropriate release of information to allow the counselor to provide such information to the practice supervisor and the disciplinary administrator.

4.     *Lawyers Group*. The respondent will attend the Lawyers Group at the Wichita Bar Association throughout the period of probation.

5.     *Continued Cooperation*. The respondent will continue to cooperate with the disciplinary administrator. If the disciplinary administrator requests any additional information, the respondent will timely provide such information.

6.     *Additional Violations*. The respondent will not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the respondent will immediately report such violation to the practice supervisor and the disciplinary administrator. The disciplinary administrator will take immediate action directing the respondent to show cause why the probation should not be revoked.

22

"27.    Costs are assessed against the respondent in an amount to be certified by the office of the disciplinary administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer. He was also given adequate notice of the hearing before the panel where he appeared by counsel and in person. He filed no exceptions to the final report of the panel, which found a violation of KRPC 8.4(g) (2017 Kan. S. Ct. R. 379) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2017 Kan. S. Ct. R. 255). Furthermore, the evidence before the panel establishes the charged misconduct in violation of KRPC 8.4(g) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions regarding those standards.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the panel hearing, the office of the Disciplinary Administrator recommended that if the panel found the respondent attempted to consummate a sexual relationship with a past or prospective client, the appropriate discipline would be a one-

23

year suspension, with 90 days to be served, followed by probation; however, if the panel found that the respondent did not attempt to consummate a sexual relationship with a past or prospective client, the appropriate discipline would be a one-year suspension, the suspension stayed, and the respondent placed on probation subject to the terms and conditions of his probation plan supervised by a licensed attorney. Respondent requested permission to supplement the record with a proposed probation supervisor and that he be disciplined by either published censure or probation. The panel unanimously recommended that respondent be disciplined by a one-year suspension and that, after serving 30 days, he be placed on probation for two years subject to the terms and conditions listed in the final hearing report.

At the hearing before this court, the Deputy Disciplinary Administrator argued that the December 6, 2017, affidavit filed by respondent's practice supervisor, included in respondent's Supreme Court Rule 211(g) submission (2017 Kan. S. Ct. R. 251) filed December 7, 2017, establishes that respondent is not in compliance with his own proposed probation plan in at least two ways. She specifically pointed out that respondent has not been attending the Wichita Bar Association "Lawyers' Group" monthly meetings since his meeting with his practice supervisor, Roger Falk, on June 23, 2017. According to respondent's motion to supplement his amended probation plan, filed June 28, 2017, respondent and Falk had agreed he would do so. That motion describes the Wichita Bar Association group meetings as "an off-shoot of the Wichita Bar Association's Lawyer Assistance Program" and is "comprised of lawyers who suffer from a variety of psychological issues."

She also pointed out that respondent had not attended regular monthly meetings with Falk, i.e., failing to meet between July 21 and November 29, 2017. Respondent's proposed probation plan provided that Falk "will meet with Mr. Phillips, at his office, 1919 North Amidon, Wichita, Kansas, a minimum of once per month . . . so I [Falk] can review the files he is working on."

24

The respondent argued that he met frequently with Falk both in the courthouse and at lunch. He also stated that while he did not attend the Lawyers' Group meetings due to a calendar conflict with his parenting time with his sons, he attended extra AA meetings weekly.

Because of the concerns about respondent's adherence to his proposed probation plan, the Deputy Disciplinary Administrator recommended that his license to practice law in the state of Kansas be suspended for 12 months, that he not be granted probation, and that he undergo a reinstatement hearing pursuant to Rule 219(d) (2017 Kan. S. Ct. R. 263). In contrast, the respondent requested a 30-day suspension and probation.

This court agrees with the recommendation of the Deputy Disciplinary Administrator and holds that respondent's license to practice law in the state of Kansas be suspended for one year, that he not be granted probation, and that he undergo a reinstatement hearing pursuant to Rule 219(d). While Falk's affidavit explained respondent missed his August meeting with him because of "some urgent thing that was going on with" respondent's two minor sons, the respondent offered no explanation to this court for why he failed to reschedule for that month. He also offered no explanation for why he failed to formally meet with Falk during September and October, even though Falk's affidavit stated they saw each other at least once a week at the courthouse during those months—and Falk reminded "him that we needed to meet, on a formal basis, regularly, at least once a month." Chance meetings at the courthouse do not fulfill the probation condition that the meeting occur at respondent's law office so that Falk "can review the files he [respondent] is working on, his calendar, and talk to his legal assistant Vicky."

While respondent explained he missed the monthly Lawyers' Group meetings because they conflicted with his court-allocated visitation with his sons, he offered this

25

court no explanation for why he did not instead eliminate the conflict by seeking modification of this probation plan condition. Nor did he explain why he waited until November 29 to notify his supervisor Falk that he was violating the terms of his proposed probation by missing the meetings.

Moreover, respondent did not address other compliance issues raised by Falk's December 6 affidavit. Specifically, respondent did not sign "the necessary information releases" for his therapist to speak directly with Falk until after their meeting on November 29—five months after he agreed to this condition. Per respondent's proposed plan, "Mr. Phillips will sign appropriate releases for his psychologist, Dr. Renee Fields to be able to talk to me [Falk] about her care and treatment of Mr. Phillips. . . . I will contact Dr. Fields at least once a month, to check on Mr. Phillips' progress in treatment." Additionally, at least as of December 1, Falk had not provided the Disciplinary Administrator any reports regarding respondent's "conduct while working this probation plan"—although the panel's recommended probation conditions required Falk to "prepare a quarterly report to the disciplinary administrator regarding the respondent's status on probation."

In short, respondent's post-hearing conduct has not shown this court he will fulfill the conditions of any probation plan in the future.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Daniel Hart Phillips be and is hereby disciplined by suspension for a period of one year in accordance with Supreme Court Rule 203(a)(2) (2017 Kan. S. Ct. R. 234), that he not be granted probation, and that he undergo a reinstatement hearing pursuant to Rule 219(d), effective upon the date of the filing of this decision.

26

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this decision be published in the official Kansas Reports.